## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MELVIN B. EVANS, JR.,**<br>**DANYELL KILLION, and**<br>**MICHAEL PERKINS,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**CITY OF ATLANTA; and**<br>**GARRETT ROLFE, Individually.**<br><br>    **Defendants.** | **CIVIL ACTION**<br>**FILE NO.: _____** |

## <u>COMPLAINT FOR DAMAGES</u>

**COME NOW** Plaintiffs, MELVIN B. EVANS, JR., DANYELL KILLION, and MICHAEL PERKINS, and hereby file this complaint against Defendants CITY OF ATLANTA and GARRETT ROLFE, in his individual capacity, and show the Court as follows:

**INTRODUCTION**

This action arises from the shooting death of Rayshard Brooks on June 12, 2020.[1] Following this incident charges were filed against APD officers Garrett Rolfe and Devin Brosnan by the Fulton County District Attorney's Office.   The prosecution of those charges was reassigned to a special prosecutor appointed by the Georgia Attorney General, who announced on August 23, 2022, that all charges against Rolfe and Brosnan arising from this incident were being dropped.  Therefore, pursuant to O.C.G.A. § 9-3-99, the statute of limitations in this matter was tolled until the final decision to dismiss all charges against Rolfe and Brosnan.[2]

**PARTIES, JURISDICTION AND VENUE**

1.

Plaintiff **MELVIN B. EVANS, JR.**, ("Plaintiff Evans"), at all times relevant, is and was a resident of the State of Tennessee, residing at 3476 Foxleigh Drive,

---

[1] This suit involves claims against the City of Atlanta and Garrett Rolfe arising from the death of Rayshard Brooks that were asserted in the related case of *Miller et al v. The City of Atlanta*, Georgia et al, 1:21-cv-03752-SDG.

[2] O.C.G.A. § 9-3-99 provides as follows: "The running of the period of limitations with respect to any cause of action in tort that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime committed in this state shall be tolled from the date of the commission of the alleged crime or the act giving rise to such action in tort until the prosecution of such crime or act has become final or otherwise terminated, provided that such time does not exceed six years."

Shelby County, Memphis, Tennessee 38115.  Mr. Evans is subject to the jurisdiction of this Court.

2.

Plaintiff **DANYELL KILLION**, ("Plaintiff Killion"), at all times relevant, is and was a resident of the State of Tennessee, residing at 3476 Foxleigh Drive, Shelby County, Memphis, Tennessee 38115.  Ms. Killion is subject to the jurisdiction of this Court.

3.

Plaintiff **MICHAEL PERKINS**, ("Plaintiff Perkins"), at all times relevant, is and was a resident of the State of Tennessee, residing at 1260 East Mallory, Shelby County, Memphis, Tennessee 38106. Plaintiff Perkins is subject to the jurisdiction of this Court.

4.

Defendant **GARRETT ROLFE**, ("Officer Rolfe"), at all times relevant, is and was a resident of the State of Georgia, currently residing at 1840 Jenny Lane, Lithia Springs, Douglas County, Georgia 30122-2857.  Officer Rolfe is subject to the jurisdiction of this Court.  Officer Rolfe, in his capacity as a police officer, was responsible for policing the City of Atlanta under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of

-3-

the State of Georgia and the City of Atlanta Police Department. The actions of Officer Rolfe that are the subject of this Complaint were undertaken in the regular course of his employment as a police officer for the City of Atlanta. Officer Rolfe is sued in his individual capacity and is a resident and citizen of the State of Georgia

5.

Defendant **CITY OF ATLANTA** ("City of Atlanta"), at all times relevant times, is and was a municipal corporation organized and existing under the laws of the State of Georgia and is responsible for the policies, practices, customs and regulations of the City of Atlanta Police Department (sometimes referred to as "APD"); and for the hiring, training, supervision and discipline of agents, employees and police officers of the APD. Defendant City of Atlanta may be served by serving Mayor Andre Dickens, through the City of Atlanta Department of Law, 55 Trinity Avenue, Suite 5000, Atlanta, Georgia 30303.

6.

This is an action brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments of the Constitution of the United States as applied to the State of Georgia and its entities, officials, and employees, as well as the statutes and common law of the State of Georgia. Venue is proper in the Northern District of Georgia, Atlanta Division, as all acts complained of occurred in Fulton

County, Georgia. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and 1391.

## **FACTUAL ALLEGATIONS**

### 7.

On the evening of June 12, 2020, Rayshard Brooks was in the driver's seat of a vehicle and was stopped in the drive-thru line at a Wendy's restaurant located at 125 University Avenue, City of Atlanta, Georgia.

### 8.

While stopped in the drive-thru line, Mr. Brooks briefly fell asleep and was unaware that the vehicles ahead of him in line had pulled forward.

### 9.

A Wendy's restaurant employee called 911 and reported that a person, Mr. Brooks, was asleep in his vehicle and stopped in the drive-thru lane.

### 10.

Officer Brosnan was dispatched to investigate the report.

### 11.

Officer Brosnan arrived at Wendy's and observed Mr. Brooks asleep in the driver's seat of his vehicle that was stopped and not moving in the drive-thru line.

12.

Officer Brosnan approached the driver's side window of Mr. Brooks' vehicle and woke Mr. Brooks.

13.

After Officer Brosnan awakened him, Brooks calmly answered each of Officer Brosnan's questions.

14.

While detaining Mr. Brooks, Officer Brosnan directed Mr. Brooks to drive his vehicle from the drive-thru line to an open parking space a few feet away.

15.

Mr. Brooks complied with Officer Brosnan's direct command by driving his vehicle from the drive-thru lane into the open parking space as directed.

16.

Mr. Brooks opened the driver's door and complied with Brosnan's request for his name and date of birth.

17.

Mr. Brooks was sitting in the driver's seat of his vehicle and speaking to Officer Brosnan with the driver's door open when Officer Rolfe arrived at the Wendy's parking lot.

18.

Officer Rolfe exited his patrol vehicle and walked toward Officer Brosnan and Mr. Brooks.

19.

Officer Brosnan briefly left Mr. Brooks alone at his vehicle and walked over to meet Officer Rolfe; at which point, Officer Brosnan advised Officer Rolfe that he observed Mr. Brooks asleep in his vehicle which was stopped in the drive-thru line; that he initiated a traffic stop and woke Mr. Brooks up and that Mr. Brooks then complied with Officer Brosnan's commands to pull his vehicle from the drive-thru lane into a marked parking spot.

20.

Officer Rolfe then asked Mr. Brooks various questions regarding why he was at Wendy's and Mr. Brooks answered his questions.

21.

Officer Rolfe asked Mr. Brooks to exit the driver's seat but to first take his hat off and leave it in the car.  Mr. Brooks complied and took his hat off and exited the driver's seat as directed.

22.

Officer Rolfe asked Mr. Brooks whether he could pat him down to search him for weapons, in response to which Mr. Brooks politely replied, "absolutely," and voluntarily consented to a pat-down search.

23.

During the pat down, Officer Rolfe asked Mr. Brooks what he had in his pockets and Brooks explained that it was money which Officer Rolfe thereafter confirmed.

24.

Officer Rolfe determined that Mr. Brooks did not have any weapons in his possession after the pat down.

25.

Officer Rolfe asked Mr. Brooks to put his cell phone on the car; Brooks complied.

26.

Officer Rolfe directed Mr. Brooks to complete a series of field sobriety tests, each of which Brooks completed without incident.

27.

During the investigation and before arrest, Mr. Brooks was polite and responded to Officer Rolfe's questions, and complied with all commands given to him while completing the field sobriety tests and did not physically resist or attempt to flee. Mr. Brooks did as he was asked; he did not make any statement which constituted a threat to the officers, nor did he take any action which constituted a threat to the officers.

28.

After completing the field sobriety tests, Officer Rolfe directed that Mr. Brooks submit to a preliminary breath test for alcohol.

29.

Mr. Brooks was confused about what the test entailed but nevertheless cooperated and complied with Officer Rolfe's commands to submit to the breath test.

30.

Mr. Brooks asked Officer Brosnan and Officer Rolfe if he could simply lock up the car and "just go home" by walking to his sister's house.

31.

Soon after completing the breath test, Officer Rolfe began to place handcuffs on Mr. Brooks to arrest him.

32.

Mr. Brooks appeared surprised and did not understand why he was being handcuffed.

33.

Officer Rolfe did not explain that Mr. Brooks was being arrested.

34.

As Officer Rolfe began to handcuff Mr. Brooks, he pulled away from the officers, who then took Mr. Brooks to the ground, where they were both positioned on top of him.

35.

After being taken to the ground, Mr. Brooks did not immediately resist the officers. As he was on the ground with the officers positioned over him, and trying to deescalate the situation, Mr. Brooks repeatedly said "Mr. Rolfe, Mr. Rolfe."

36.

Officer Brosnan was in possession of a taser weapon which had been issued to him by the City of Atlanta Police Department. He drew the taser and threatened Mr. Brooks with it while Mr. Brooks was on the ground.

37.

Officer Brosnan discharged his taser in drive stun mode onto Mr. Brooks' leg, which caused Mr. Brooks to grab Officer Brosnan's taser to stop its continued use.

38.

Officer Brosnan was not authorized to carry the taser he used against Mr. Brooks. Pursuant to APD's written policy in effect at the time of Mr. Brooks' death, "[o]nly officers who have completed the Training Section's approved certification course of instruction on the carry, use, and maintenance of the CEW shall be authorized to carry and use the device."

39.

At all times material herein, Officer Brosnan had not completed APD's mandatory taser certification course and was not authorized to handle, carry, use, or maintain any taser weapon.

40.

After Mr. Brooks grabbed Officer Brosnan's taser, to prevent Officer Brosnan from continuing to use it to shock Brooks, a struggle ensued.

41.

During the entire struggle with the officers, Mr. Brooks did not punch or kick the officers.

42.

During the struggle with the officers, Mr. Brooks gained control of Officer Brosnan's taser.

43.

During the struggle, the taser discharged once but did not strike any officer.

44.

Officer Rolfe knew that Officer Brosnan's taser had been discharged.

45.

Mr. Brooks then began running away from the Officers.

45.

Officer Rolfe then retrieved his own taser with his right hand and shot it at Mr. Brooks twice as Brooks ran away. Those taser shots were ineffective, and Brooks continued to run from the Officers.

46.

Officer Rolfe chased Mr. Brooks on foot while holding his taser in his right hand.

47.

As Mr. Brooks ran, he outpaced Officer Rolfe and was increasing the distance between himself and the officers.

48.

As Mr. Brooks ran, Officer Rolfe began to unholster his firearm while running after Brooks.

49.

As Mr. Brooks was running away with his back to the two officers, he did not threaten or run toward any other person.

50.

Both officers knew that Mr. Brooks had been peaceful and compliant until the moment of his unexpected arrest.

51.

Neither officer had any basis to believe that Mr. Brooks intended to harm any other person as he ran from the officers.

52.

As Mr. Brooks continued to run away from Officer Rolfe, Brooks turned and discharged the taser he was carrying.

53.

At the time Mr. Brooks discharged the taser, Rolfe was outside the range of the taser.

54.

Based on his training, Officer Rolfe knew at the time Mr. Brooks discharged the taser that he was outside the effective range of the weapon. He knew that the prongs of a taser can only extend a limited distance—and that he was beyond that distance.

55.

The prongs from the taser did not come close to striking either officer or any other person, and Mr. Brooks continued to run away from the officers.

56.

After Mr. Brooks discharged the taser, and as he continued to run away from the officers, Officer Rolfe raised his firearm and fired three shots aimed at Mr. Brooks' back.

57.

When Officer Rolfe fired his gun at Mr. Brooks, Officer Rolfe was the closest person to Mr. Brooks.

58.

At the time he was shot by Officer Rolfe, Mr. Brooks was rapidly increasing the distance between himself and Officer Rolfe and there was nearly twenty feet of distance between the two.

59.

At the time he was shot by Officer Rolfe, Mr. Brooks' back was completely turned away from Officer Rolfe, and Mr. Brooks was running away from Officer Rolfe.

60.

At the time he was shot by Officer Rolfe, Mr. Brooks was not running toward any other person.

61.

When Officer Rolfe shot Mr. Brooks, he knew or should have known, that based on his training and experience, that the taser Brooks was carrying had been discharged twice, it could only be used in "drive stun" mode.

62.

Officer Rolfe knew, or should have known, that based on his training and experience, that when a taser can only be used in "drive stun mode," the prongs are discharged and no longer available; instead, in drive stun mode the taser is pressed directly against a person's skin. That mode can be used to cause pain, but it generally does not incapacitate a person as the prong mode is designed to do.

63.

Officer Rolfe knew, or should have known, that a taser used in "drive stun mode" does not cause serious physical injury.

64.

Officer Rolfe knew, or should have known, that the taser possessed by Brooks could only be used in drive stun mode because it had already been discharged twice.

65.

Officer Rolfe did not provide any warning prior to firing his gun.

66.

Officer Rolfe shot three bullets at Mr. Brooks, despite knowing that the weapon held by Brooks could not be used to cause serious physical injury, and that Mr. Brooks was running away from the officers and not posing a danger to any other person.

67.

At the time of this incident, Plaintiff Evans was parked in the drive-thru of the Wendy's in his Chevrolet Trailblazer.  Plaintiffs Killion and Perkins were passengers in the car with Plaintiff Evans.

68.

At the time of this incident, Mr. Brooks was running in the direction of Plaintiff Evan's vehicle.  Two of Officer Rolfe bullets struck Mr. Brooks in the back and caused him to immediately collapse to the ground, while the third bullet struck Plaintiff Evan's vehicle, which forced Plaintiffs to duck under their seats in immense fear that they too would be hit in the line of fire.

69.

The third shot, that was fired after Mr. Brooks was already lying down and struggling for his life, struck Plaintiff Evans' vehicle, barely missing him.

70.

Multiple videos captured of the incident reveal that this tragedy could have been avoided by just letting Mr. Brooks run away.

71.

Instead, Officer Rolfe celebrated Mr. Brook's death by kicking him and yelling "I got him", after opening fire in a crowded parking lot, thereby putting the lives of many innocent bystanders, including Plaintiffs.

72.

As a result of being assaulted by Officer Rolfe's shooting into Plaintiff Evan's vehicle, each of the Plaintiffs suffered physical and emotional injuries from this incident.

73.

As a result of this incident, each of the Plaintiffs have suffered and continue to suffer from emotional injuries from the violent assault by gunfire into their vehicle, which placed them in reasonable apprehension of immediate violent injury, to include death, entitling Plaintiffs to damages and compensation in an amount to be determined by the jury.

## APD's POLICY AND TRAINING RELATED TO THE USE OF DEADLY FORCE

74.

Officer Rolfe was trained by the City of Atlanta that deadly force was authorized in response to any "violent, unlawful, aggressive resistance to a lawful arrest."

75.

Officer Rolfe maintains that his actions in shooting and killing Mr. Brooks were authorized by City of Atlanta policy and the training he received during his employment with the City of Atlanta because, at some point prior to the shooting, Mr. Brooks resisted arrest and then fled from officers.

76.

Pursuant to its official policy, the City of Atlanta trains its officers that deadly force is authorized against any fleeing suspect who at some point earlier may have inflicted or threatened serious if the suspect poses a "continuing danger" of serious harm if allowed to escape, regardless of the immediacy of any such threat at the time deadly force is used.

77.

One form of training provided by the City of Atlanta is reality-based training in the form of a shooting simulator. In that simulator, officers are presented with scripted scenarios designed to place officers in real-world shoot/don't shoot scenarios. The training provided to officers through those scenarios teach that it is permissible to shoot a suspected fleeing felon if that suspect has physically resisted arrest, without regard to any continuing imminent danger posed by the suspect.

78.

City of Atlanta policy and training provide that an officer may use deadly force against a suspected fleeing felon if the underlying crime involved the "threatened infliction of serious harm" even if that suspect does not pose an immediate or imminent danger of future harm to any person or officer.

79.

Officer Rolfe was consciously aware of the training he received from the City of Atlanta which set forth the circumstances in which deadly force was authorized when he shot and killed Rayshard Brooks.

80.

Officer Rolfe relied on the training he received from the City of Atlanta when determining whether to shoot Rayshard Brooks.

81.

The training received by Officer Rolfe from the City was the driving force behind his decision to shoot Rayshard Brooks as Brooks ran away.

## THE PATTERN OF UNCONSTITUTIONAL APPLICATION OF THE CITY'S DEADLY FORCE POLICY AND TRAINING

82.

The City's policy and training related to the use of deadly force by its police officers is further demonstrated through the following examples.

*Maurice Hampton*

83.

On June 30, 2011, Officer Thomas Atzert pulled over a vehicle that was being driven by Maurice Hampton. <u>See</u> Brad Schrade & Jennifer Peebles, Unarmed and Shot in the Back, AJC, https://investigations.ajc.com/overtheline/ga- police-shootings/ (last visited Oct. 2, 2020).

84.

Maurice subsequently fled from the traffic stop and was pursued by Officer Atzert, who engaged in a physical struggle with Maurice. *Id.*

85.

When Maurice broke away from the struggle and began to run away, Officer Atzert shot him in the back, killing him. *Id.*

86.

Mr. Hampton did not pose an immediate danger to any person as he fled and the sole basis for the use of force against him was the City's policy and training that the use of deadly force was authorized because Hampton was a fleeing felon.

*Jamarion Robinson*

87.

On August 5, 2016, a task force that included Atlanta police officer William Sauls was attempting to arrest Jamarion Robinson for outstanding warrants. See Catherine Park, U.S. Marshals Task Force Accused of Excessive Force, Cover Up After Shooting Man 76 Times, 11 ALIVE (Jan. 10, 2018), https://www.11alive.com/article/news/local/lawrenceville/us-marshals-task-force-_accused-of-excessive-force-cover-up-after-shooting-man-76-times/85-506792680.

88.

The task force knew that Jamarion was schizophrenic and was not taking his medication. *Id.*

89.

When the task force attempted to arrest Jamarion, its members broke down the door of the apartment where he was located, entered the apartment, and began shooting their submachine guns and handguns at him. *Id.*

90.

Jamarion Robinson was ultimately shot 76 times. *Id.*

91.

In an ensuing cover-up, members of the task force claimed that Jamarion Robinson engaged in a shootout with officers. *Id.*

92.

In truth, however, Robinson was unarmed when they shot him 76 times. *Id.*

93.

Atlanta police officer William Sauls was not disciplined for his involvement in Jamarion's death and remained with the Atlanta Police Department, where he would continue to use excessive force. *Id.*

*Saleem Wilson*

94.

On December 22, 2018, Officers Ian Mayfield and Virginia Pena Barrientos approached Saleem Wilson and another man in a McDonald's dining room. See Janice Yu, Atlanta Man Files Lawsuit Against APD and Officer following 2018 Shooting, FOX 5 ATLANTA (June 24, 2020), https://www.fox5atlanta.com/news/atlanta-man-files-lawsuit-against-apd-and-officer-following-2018-shooting.

95.

Officers Mayfield and Barrientos confiscated guns that were among the possessions of Saleem Wilson and the third party. Both men were then unarmed. *Id.*

96.

Upon having his gun confiscated, Saleem Wilson got up and began to run from the Officers, at which point he was simultaneously tased by Officer Barrientos and shot in the back of his neck by Officer Mayfield with the third party's gun (not his department-issued firearm). *Id.*

97.

After the shooting, Officers Mayfield and Barrientos lied about the circumstances leading up to the shooting. *Id.*

98.

Officer Mayfield reported that Saleem shot himself with his own gun while Officer Barrientos's statement did not mention seeing Officer Mayfield pursuing Saleem with a gun in his hand or hearing a gunshot. *Id.*

99.

Both officers remain employed with the Atlanta Police Department, even though the Fulton County District Attorney's Office is investigating the incident for possible criminal charges. *Id.*

*Jimmy Atchison*

100.

On January 22, 2019, Officer Sung Kim was serving as part of a federal task force that was attempting to arrest Jimmy Atchison. <u>See</u> Christian Boone, New Details About FBI Task Force Shooting of Unarmed Man, AJC (Oct. 29, 2019), https://www.ajc.com/news/crime--law/new-details-about-fbi-task-force-   shooting-unarmed-man/udjLPncbiB4ISAEcIvybSN/.

101.

When the task force attempted to arrest Jimmy, he fled the original location where he encountered law enforcement and hid in the closet of a friend's apartment. *Id.*

102.

When officers found Jimmy, he was unarmed and emerged from the closet with his hands up, at which point Officer Sung Kim shot Jimmy in the face, killing him. *Id.*

103.

As is routine practice by APD, Officer Kim was allowed to retire in lieu of termination. <u>See</u> Raisa Habersham, Atlanta Cop Retires After New Details Emerge in FBI Task Force Shooting, AJC (Nov. 1, 2019),

https://www.ajc.com/news/local/atlanta-cop-retires-after-new-details-emerge-fbi-task-force-shooting/HneBGNgnBKhDdUp26FuNCL/.

*Prior incidents involving Officer Rolfe – Jackie Harris*

104.

The subject incident is not the first time Officer Rolfe unlawfully used his firearm under circumstances which did not authorize the use of deadly force.

105.

Officer Rolfe unlawfully used his firearm against Jackie Harris by shooting him in the back on August 2015 while Mr. Harris was not posing an immediate threat to authorize the use of deadly force

106.

None of the initial incident reports prepared by the involved officers reflected that Mr. Harris had been shot or seriously injured.

107.

After he was released from the hospital, Mr. Harris filed several complaints with APD against all three officers alleging that they used excessive deadly force by shooting him.

108.

The City of Atlanta has made no disciplinary findings or even completed an investigation into Mr. Harris' complaints against Officers Rolfe, Harp, and Castro alleging that they used unlawful deadly excessive force by shooting him.

109.

Officer Rolfe's Disciplinary Record as it pertains to the Harris incident reflects that as of June 14, 2020, said complaint remained unresolved.

110.

On May 10, 2016, Mr. Harris appeared before the Honorable Doris L. Downs in the Fulton County Superior Court to enter a plea in *State of Georgia v. Jackie Harris*, Indictment No. l5SCl37198.

111.

Based on the incident report and evidence presented to the Court at or before the plea hearing on May 10, 2016, the Court publicly chastised each of the three officers – Officers Rolfe, Harp, and Castro – in open court for their misconduct in failing to include in their reports that they used their firearms and shot Mr. Harris.

> AND THE KICKER IS THAT THE POLICE —— NONE OF THE POLICE PUT IN THE REPORT THAT THEY SHOT THE MAN, NONE OF THEM, AND THEY SENT HIM TO GRADY WITH COLLAPSED LUNGS AND EVERYTHING, AND THE REPORT DOESN'T MENTION IT. I AM ETHICALLY GOING TO BE REQUIRED TO TURN ALL OF

THEM IN I MEAN TO THE POLICE, AN INVESTIGATION. I MEAN, SOMEBODY NEEDS TO LOOK INTO THIS. THIS IS VERY STRANGE.

WELL, TO ME YOU COULD STUDY THIS CASE FOR THE REST OF YOUR LIFE. I INTEND TO TURN IT IN TO INTERNAL INVESTIGATION OF SOME KIND, OR THE GBI. I THINK IT'S THE WILDEST CASE I'VE EVER SEEN IN MY 34 YEARS HERE.

112.

Despite the matter being referred for investigation by the Court, the City of Atlanta took no investigatory or disciplinary action against Officers Rolfe, Harp, or Castro in connection with the Harris incident, whether related to their unlawful use of deadly force or their failure to accurately report the same in their incident reports.

113.

Had APD properly investigated Officer Rolfe's improper use of a firearm in using deadly force against Mr. Harris, it would have concluded that deadly force was not authorized under the circumstances presented and that Rolfe's use of deadly force was excessive and violated Mr. Harris' constitutional rights as well as APD policy.

*Prior incidents involving Officer Rolfe – Antraveious Payne*

114.

On September 15, 2016, Officer Rolfe was involved in another incident involving the improper use of his firearm wherein Rolfe retrieved and pointed his

gun against Antraveious Payne under circumstances which did not authorize the use of deadly force.

115.

APD sustained the firearms violation against Rolfe and concluded that by retrieving his firearm and pointing it at a suspect in circumstances which did not authorize the use of deadly force, Officer Rolfe improperly "used" his firearm in violation of APD policy.

116.

Officer Rolfe's Disciplinary History record as it pertains to the Payne incident reflects that APD sustained a violation for improper use of firearms against Officer Rolfe, and issued a written reprimand for a Category "A" violation:

> **16I0644UAF     Case #: 162591782     Use of force**
>
> 6.09 Use of Firearms 09/19/2016 [A] - SUSTAINED Oct 5, 2017
>
> Related actions taken:
>   Oct 5, 2017 WRITTEN REPRIMAND

117.

Pursuant to APD policy, sustained policy violations are categorized into four different categories ranging from A to D, with the severity of misconduct and mandatory disciplinary action progressively increasing – "Category 'A' infractions represent the least egregious kind of misconduct while categories 'B,' 'C,' and 'D' represent progressively more serious types of misconduct." APD SOP 2020 4.4.1.

118.

Category "A" violations are only reserved for minor rule violations such as work appearance, tardiness, and failing to appear for court which do not include improper use of a firearm.

119.

A sustained finding that an officer improperly used a firearm is not a minor rule violation and is at a minimum a Category "B" violation.

120.

On July 25, 2017, Officer Rolfe's supervisor completed his Disciplinary Worksheet and properly categorized his improper use of a firearm as a Category "B" violation.

121.

Officer Rolfe's Category "B" violation for improper use of his firearm in connection with the Payne incident occurred within the reckoning period of the Harris incident wherein he likewise improperly used his firearm.

122.

A Category "B" violation "occurring within the reckoning period of a same, similar or related past violation is increased another category level." APD SOP 2020 4.4.3.

123.

At a minimum, Officer Rolfe's sustained Category B violation for improper use of a firearm in connection with the Payne incident should have been increased to Category C with a mandatory discipline range of a 4 to 15-day suspension and/or demotion. APD SOP 2020 4.4.4.

124.

Without explanation, APD did not increase Officer Rolfe's sustained Category B violation to a Category C as required by mandatory policy, and instead improperly decreased it to a Category A violation on or about October 5, 2017 for which he only received a written reprimand.

125.

APD has a custom and practice of accepting false versions of police officers concerning its officers' use of physical force. The effect of this practice resulted in the death of Rayshard Brooks.

126.

The City of Atlanta, by and through the recurrent practices of its police officers, including those charged with the investigation of civilian complaints of police abuse, has a custom and practice on the part of its offices as follows:

a.     an officer commits an act of violence or an act of other breach of the

constitutional rights of a civilian;

b.      said officer falsely reports that they did not engage in the act of violence nor any other act constituting a breach of the constitutional rights of a civilian;

c.      both the officer, along with and those officers designated to supervise that officer or to investigate the conduct of the officer, accept the officer's false statement concerning their conduct towards the civilian and either refuse or fail to even report the physical misconduct or, if they report that an incident occurred, they adopt the officer's false version of events despite immediately available evidence contradicting the officer's false version.

127.

By way of example, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification.

*Tyrone Carnegay*

128.

In October 2014, Officer Trevor King was off-duty and working security at a Walmart store when he attempted to detain Tyrone Carnegay, who he believed to be shoplifting a tomato. See Ex-Atlanta Cop Gets 5 Years for Beating Walmart

Customer    Over    'Stolen'    Tomato,    AJC    (May    8,    2018),

https://www.ajc.com/news/crime--law/atlanta-cop-gets-years-for-beating-walmart-

customer-over-stolen-tomato/jSnD2Crf5H94c9WjeU5p9I/.

### 129.

When Tyrone Carnegay attempted to exit the store, Officer King struck him

seven times with a metal baton, breaking two bones in his legs (including a severe

compound fracture). *Id.*

### 130.

Incredibly, Officer King then arrested his victim and charged him with

obstructing a police investigation and assaulting a police officer. *Id.*

### 131.

Officer King lied in the police report that he filed following the incident and

indicated that Tyrone Carnegay reached for a gun. *Id.*

### 132.

Surveillance footage revealed that these claims were not true, and Officer

King was federally charged with using unreasonable force and falsifying a police

report. *Id.*

133.

Despite the shocking conduct and criminal charges, Officer King was not fired from the APD. Instead, he was permitted to retire. *Id.*

134.

As a result of APD permitting King to "retire" rather than be terminated, King was able to keep retirement benefits and APD was able to avoid tacitly acknowledging that its employee engaged in wrongful conduct.

135.

Officer King was nonetheless ultimately convicted on federal charges and sentenced to five years in prison. *Id.*

*David Childs*

136.

On May 7, 2003, an uninterested bystander observed Officer Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same.

137.

Despite the bystander's willingness to submit to a lie detector test to confirm his veracity, APD did not perform a lie detector test, and did not review the available

surveillance video footage which would have confirmed or denied the allegation against Gardner; APD had knowledge that the head wounds Childs sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force at the precinct was true.

*Raymond Clay*

138.

On July 1, 2006, an arrestee (Raymond Clay) informed APD that Officer Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Officer Gardner used excessive force was true.

*Jermichael Lockette*

139.

On November 10, 2006, Jermichael Lockette informed APD that two APD Officers Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

140.

Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007 which indicated deception when the officers denied using force against Lockette.

141.

Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

142.

On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

143.

On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

144.

Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

145.

At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

*Karla Weems*

146.

Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside.  The officers released all occupants after determining that the

subject of their search was not present. APD did not subject any of the officers who were present to CVSDs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

*Ezoeke Parks*

147.

Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year-old daughter by her neck and kneed her in her stomach. The ACRB concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officer without subjecting anyone to a CVSD. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

*Bailey Cato*

148.

Bailey Cato informed APD that on September 14, 2014, APD Officers Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. APD and the Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

*Richard Williams*

149.

Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the

arrest. APD did not subject any officers to CVSA exam and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

*Dr. Jay Berger*

150.

On the evening of August 25, 2012, Dr. Jay Berger was arrested by APD Officer Lawrence. Mr. Berger filed a complaint with the City alleging that the officer struck his knee with such force that it tore his ACL and caused other bodily harm during his arrest, ultimately requiring hospitalization and surgery; the City blindly accepted the officer's unsupported denials of wrongdoing and denial of knowledge of any force being used on Berger's knee, despite the absence of any explanation as to how Berger sustained a documented serious knee injury during arrest. The City of Atlanta continued to accept the officer's denial of the use of any force upon Berger even after a civil trial in federal court resulted in a verdict in favor of Berger finding that Officer Lawrence had used excessive force against Berger.

*Randal Brooks*

151.

In March of 2010, Randal Brooks was arrested and tackled to the ground by Officers Alexander and Murden of the City of Atlanta Police Department.

152.

Before being tackled he was uninjured and fully able to walk.  Once taken to the ground, Randal Brooks was on his stomach and the two officers forced their knees into his spine and neck area.

153.

During his arrest, Randal Brooks' spine was fractured and he was paralyzed as a result of physical force applied directly to his spine.

154.

The nature of his spinal injury was documented to be consistent with a knee having been positioned onto his spine, accompanied with a significant amount of force applied to his spine. There is no other available explanation for just how Randal Brooks' spine was fractured. Brooks remained paralyzed from the neck down throughout the remainder of his life; he died in 2012.

155.

Each of the officers at the scene of Randal Brooks' arrest claimed that they did not apply, nor did they see any other officer apply, any force to Brooks' cervical spine. Despite the catastrophic nature of the injury, the officers repeated their claims to superior officers who merely accepted their story.  The City of Atlanta continued to accept the officers' denial of the use of force upon Randal Brooks both before and

after settlement of Randal Brooks' Estate's claim.

*Robert Doe*

156.

Another example of this custom and practice involves Robert Doe. The last name is withheld because the victim of the officer's force was a minor at the time. In December of 2019, Robert Doe's legs were shattered by the reckless use of force by APD Officer Erik Clanton.

157.

Robert was alleged to be selling water bottles to passing motorists when he was approached by Officer Clanton and another officer in mid-town Atlanta.

158.

Fearful of police officers, Robert ran away. Robert reached and scaled a fence. As Robert reached the other side of the fence, below which was a 20–30-foot drop to a highway, Clanton forcefully ran into the fence—twice—causing Robert to lose his grip on the fence and causing him to fall. The fall shattered his legs and caused a broken shoulder and facial fractures.

159.

Officer Clanton falsely reported that, rather than causing Robert's fall, he had "attempted to reach for" Robert to pull him down from the fence.

160.

Despite the availability of graphic video evidence contrary to Officer Clanton's report.  The City of Atlanta accepted Officer Clanton's denial of use of force on Robert.

*Antraveious Payne*

161.

On September 16, 2016, Atlanta police officer Matthew Johns was involved in a police chase and was pursuing a vehicle in which Antraveious Payne, a teenager, was an occupant. See Asia Simone Burns, Ex-Atlanta Officer Sentenced to 5 Years in Prison After Kicking, Choking Teen (Aug. 26, 2019), https://www.ajc.com/news/crime--law/atlanta-officer-sentenced-years-prison-after-kicking-choking teen/uRKXtUia2i7g7qHuNEfTcM/.

162.

After the police chase ended, Antraveious exited the vehicle and laid on the ground with his hands up; he was unarmed and obviously surrendered. *Id.*

163.

Nonetheless, Officer Johns ran up to Antraveious, kicked him in the head three times, and pressed his knee on the teenager's neck until he was unconscious. *Id.*

164.

Officer Johns lied about the circumstances leading up to his use of force and repeated these assertions in written statements to cover-up the excessive nature of the force that he used. *Id.*

165.

Officer Johns was fired by the Atlanta Police Department for his use of force against Antraveious and was indicted on criminal charges. *Id.*

166.

Officer Johns ultimately pleaded guilty to three counts of aggravated assault, one count of aggravated assault/strangulation, two counts of making a false statement, and two counts of violating his oath of office. *Id.*

167.

Officer Johns received a twenty-year sentence including five years in prison. *Id.*

*Messiah Young and Teniyah Pilgrim*

168.

On May 30, 2020, six APD Officer - Ivory Streeter, Mark Gardner, Lonnie Hood, Armon Jones, Willie Sauls, and Roland Claud - engaged in the use of excessive force against two college students that were leaving a protest against

police brutality. See Phil Helsel & Austin Mullen, 2 More Atlanta Police Officers Fired Over Use of Force During Protest, NBC NEWS (June 10, 2020), https://www.nbcnews.com/news/us-news/2-more-atlanta-police-officers-fired-over-use-force-during-n1229656.

169.

Messiah Young and Teniyah Pilgrim were driving down the road when they were stopped by officers who were enforcing a curfew that was issued by Mayor Keisha Lance Bottoms. *Id.*

170.

Without giving the students any time to respond to their commands, the officers broke the driver's side window with a baton, tased them both, and took them into police custody. *Id.*

171.

The incident was broadcast live on television, prompting a quick response from the City of Atlanta and the Atlanta Police Department. *Id.*

172.

All six officers were charged with crimes for their roles in the incident, including charges of aggravated assault, aggravated battery, and criminal damage to property. *Id.*

173.

Officers Streeter and Gardner were fired the day after the incident while Officers Hood and Jones were fired around a month later. *Id.*

174.

Officers Sauls and Claud remain employed with the City of Atlanta despite the criminal charges that are pending against them for aggravated assault (Officer Sauls) and criminal damage to property (both officers).

175.

Alarmingly, Officer Sauls has been involved in three fatal shootings of unarmed men, yet still remains employed with the Atlanta Police Department. See Brad Schrade & Jennifer Peebles, APD Cop in Tasing Incident Faced Earlier Excessive Force Allegations, AJC (June 4, 2020), excessive-force-allegations/9ajNXyELh8hWweqNF8Yh9J/.

**The prevalence of other incidents reinforces the City of
Atlanta's need to train its officers**

176.

Each of the following cases involves the use of deadly force against a fleeing suspect.

177.

In October 2015, Atlanta sustained firearms use violation by Officer Emanuel Thompson because the suspect did not pose a serious threat of injury, without reference to immediacy or seriousness of physical threat. The City did not terminate or discipline officer, but allowed him to resign a year after the shooting.

178.

In December 2017, Altman Hall was shot by an APD officer while standing in a doorway while, unarmed, during a standoff without.

179.

In February 2018, an APD officer shot a person who fled after officers arrived based on a "suspicious person" report.

180.

In May 2018, an officer discharged his weapon at two juvenile suspects who were fleeing police.

181.

In June 2018, an APD Officer shot a citizen after first pepper spraying and tasing him.

182.

In January 2019, a plain clothes APD officer shot at a suspect who was driving away from a gas station but who posed no other direct threat to the officer or the public. In March 2019, Officer Officer Marquee Kelley shot and killed a fleeing suspect.

## COUNT ONE

## OFFICER ROLFE'S VIOLATION OF MINISTERIAL DUTIES

183.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

184

Officer Rolfe is liable to Plaintiffs for his "neglect to perform or improper or unskillful performance of their ministerial duties" in violation of O.C.G.A. § 36-33-1(b).

185

Under Georgia law, employees of municipal corporations may be held personally liable for the negligent performance of their ministerial duties, or alternatively, if they act with actual malice or actual intent to cause injury while performing a discretionary function. See *Daniels v. Gordon*, 232 Ga. App. 811, 813

(1998) (citing *Teston v. Collins*, 217 Ga. App. 829, 830 (1995)); <u>see also</u> *Chisolm v.*

*Tippens*, 289 Ga. App. 757, 760 (2008) (citing *Nichols v. Prather*, 286 Ga. App. 889,

896 (2007).

186.

A ministerial act is commonly one that is simple, absolute, and definite

requiring merely the execution of a specific duty.  Evidence sufficient to establish a

ministerial duty include written and unwritten policies, a supervisor's directive, and

statutes.  <u>See</u> *McDowell v. Smith*, 285 Ga. 592, 593 (2009); *Hicks v. McGee*, 289 Ga.

573, 575 (2011); *Wyno v. Lowndes County*, 305 Ga. 523, 527-28 (2019); and *Roper*

*v. Greenway*, 294 Ga. 1112, 114-115 (2013).

187.

APD's work rules governing use of force dictates that "[e]mployees are

expressly prohibited from the unnecessary or unreasonable use of force against any

person or property." APD.SOP.2010, Section 4.2.50, Para. 1, Maltreatment or

Unnecessary Force, attached as **Exhibit 1**.

188.

Further, APD's work rules governing use of force dictates that "[e]mployees

shall only use that force which is reasonable and necessary to affect an arrest, prevent

an escape, …, [and] defend himself/herself or another from physical assault or to accomplish other lawful objectives. *Id.*, Para. 2.

189.

APD also has a specific standard operating procedure addressing use of force, which dictates that "[a]ll employees present during a police/citizen contact will make every effort throughout the entire encounter to de-escalate a situation and exhaust other means reasonably available in order to prevent the use of deadly force. <u>The use of lethal force should be an officer's last resort</u>." APD.SOP.3010, Section 4.2.1, Use of Deadly Force, attached as **Exhibit 2**.

190.

Following an investigation into this incident, APD determined that Officer Rolfe's use of deadly force was unreasonable, unnecessary, and in violation of APD.SOP.2010, Section 4.2.50, Para. 1, Maltreatment or Unnecessary Force.

191.

Specifically, APD determined that Officer Rolfe's "use of force in this instance was in violation of the above referenced work rule [APD.SOP.2010, Section 4.2.50, Para. 1, Maltreatment or Unnecessary Force], concluding that OFFICER ROLFE'S "use of deadly force to prevent the escape of Mr. Brooks was unreasonable." <u>See</u> Atlanta Police Department, Adverse Action Continuation,

Notice of Final Adverse Action, OPS CONTROL 20-I-0270-PS, attached hereto as **Exhibit 3**.

192.

Officer Rolfe is personally liable to Plaintiffs because his actions, as described herein, amounted to a negligent violation of ministerial duties of the City of Atlanta Police Department, including APD.SOP.2010 Work Rules, Section 4.2.50 Maltreatment or Unnecessary Force; and APD.SOP.3010, Section 4.2.1, Use of Deadly Force.

193.

The actions of Officer Rolfe, as described in the Notice of Final Action, which determined that his use of deadly force was unnecessary and improper, was the direct and proximate cause of a bullet striking Plaintiff Evans' vehicle, resulting in each of the Plaintiffs sustaining emotional and traumatic injury.

194.

Officer Rolfe negligently breached ministerial duties in violation of APD's policies and procedures relating to use of deadly force by discharging his firearm to prevent the escape of Mr. Brooks, which resulted in injuries and damages to Plaintiffs.

195.

As a result of Officer Rolfe's negligent acts and omissions, and violation of ministerial duties, Plaintiffs have suffered a battery and assault resulting in physical and emotional trauma from being within a vehicle that was shot into by Officer Rolfe.

196.

As a result of Officer Rolfe's negligent acts and omissions, and violation of ministerial duties, Plaintiff Evans is entitled to property damages resulting from his vehicle being struck by a bullet discharged from Officer Rolfe's firearm. Officer Rolfe has no sovereign immunity, official immunity or absolute immunity for his actions and omissions and is liable to Plaintiffs.

## COUNT TWO

## OFFICER ROLFE'S VIOLATION OF PLAINTIFFS FOURTH AND/OR FOURTEENTH AMENDMENT CONSTITUTIONAL RIGHTS

197.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

198.

At the time of the incident described herein, Plaintiffs had legal rights established by the Constitution of the United States, the Constitution of the State of

Georgia, and laws set forth by state and federal statutes, including rights protected by the Fourth and Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1983.

199.

Officer Rolfe's actions of shooting multiple times at Mr. Brooks while he was running through the Wendy's parking lot, resulted in one of the bullets striking the vehicle occupied by Plaintiffs who were inside the vehicle ordering food at the Wendy's drive through.

200.

As determined by APD, Officer Rolfe's actions were unreasonable, unnecessary, and in violation of APD's regarding maltreatment and unnecessary force against person or property.

201.

APD determined that Officer Rolfe's actions were not necessary for the purpose of defending himself or another from physical assault, and that he failed to de-escalate the situation with Mr. Brooks, but instead resorted to the use of deadly force.

202.

The Fourth Amendment to the United States Constitution protects citizens from unreasonable seizures by the police, which must satisfy an objectively reasonable standard based on the facts and circumstances confronting the officer. See *Graham v. Connor*, 490 U.S. 386, 397 (1989); and *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

203.

Based on the totality of circumstances, the actions of Officer Rolfe in discharging his firearm and striking the vehicle occupied by Plaintiffs was an excessive and unlawful use of deadly force that violated the civil rights of Mr. Brooks and the Plaintiffs, even if they were the unattended targets of Officer Rolfe's use of deadly force.   See *Torres v. Madrid*, 141 S. Ct. 989 (2021).

204.

The Fourteenth Amendment to the United States Constitution protects citizens from the deprivation of their right to life, liberty, and property, without due process of law.  The Fourteenth Amendment provides substantive due process protections to citizens from government power arbitrarily and oppressively exercised.  See *Wilson v. Northcutt*, 987 F.2d 719 (11th Cir. 1993); and *Hammett v. Paulding County*, 875 F.3d 1036 (11th Cir. 2017).

205.

The actions of Officer Rolfe, as described herein, were an egregious abuse of power which shocks the conscience, in violation of the Fourteenth Amendment. The conduct of Officer Rolfe in discharging his firearm in the busy parking lot of a Wendy's restaurant was malicious, shocking, and intended to injure without regard for any legitimate law enforcement purpose.

206.

Officer Rolfe is not entitled to qualified immunity, because his actions were malicious, reckless, and callously indifferent to clearly established and well-settled federal and state constitutional and statutory law, which a reasonable person in his position would have known.

207.

As a direct and proximate result of the actions of Officer Rolfe, he is liable to Plaintiffs for all damages allowed under Georgia and federal law, including damages for physical and emotional pain and suffering. Officer Rolfe is also liable to Plaintiff Evans for damage to his vehicle.

## **COUNT THREE**

### **ASSAULT AND BATTERY AGAINST OFFICER ROLFE**

208.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

209.

Under Georgia law, a person is liable for civil battery for unlawfully touching the person of another in a manner that would be offensive to a reasonable person. Georgia defines an assault to occur when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another. <u>See</u> O.C.G.A. § 51-1-13.

210.

By virtue of the facts described herein, the actions of Officer Rolfe constitute assault and battery upon the Plaintiffs, which were the direct and proximate cause of Plaintiffs' injuries, making him liable to Plaintiffs for all damages allowed under Georgia and federal law, including damages for physical and emotional pain and suffering.

## <u>COUNT FOUR</u>

## **MUNICIPAL LIABILITY OF CITY OF ATLANTA**

211.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

212.

As shown herein, the actions, omissions, systemic flaws, policies, and customs of Defendant City of Atlanta, through the Atlanta Police Department and City Lawmakers, have caused APD officers to believe that the use of excessive, deadly, or in reasonable force would not be properly, aggressively and honestly investigated, which has led to the foreseeable result that officers were likely to use excessive deadly force against citizens in the future.

213.

Years before this shooting incident, Defendant City of Atlanta, through the Atlanta Police Department and City Lawmakers, allowed a persistent and widespread practice of condoning, ratifying, and authorizing certain officers, including Officer Rolfe, to cover up and justify the use of excessive force despite the lawful authority to use such force.

214.

Years before this shooting, Defendant City of Atlanta, through the Atlanta Police Department and City Lawmakers, were aware of, and deliberately indifferent

to widespread and systemic corruption and work rule violations within the Atlanta Police Department, including violations relating to the use of force and other violations of the constitutional rights of citizens.

215.

Years before this shooting, Defendant City of Atlanta, through the Atlanta Police Department and City Lawmakers, were deliberately indifference to this practice and custom within the Atlanta Police Department, by failing to enforce policies; failing to properly train; failing to properly discipline, and thus, creating a culture within the City Atlanta Police Department wherein violating citizen's civil rights is not only tolerated, but also encouraged; thereby leading to the deprivation of Plaintiffs civil and constitutional rights, as described herein.

216.

Years before this shooting, Defendant CITY OF ATLANTA, through the Atlanta Police Department and City Lawmakers, were engaged in a persistent and widespread practice of ratifying and condoning the unlawful in illegal activity of the Atlanta Police officers including Officer Rolfe, thereby leading to the deprivation of Plaintiffs civil and constitutional rights, as described herein.

217.

The City's insufficient oversight of use of deadly force incidents, unconstitutional policy, and inadequate training create an overwhelming risk that its officers will use deadly force when doing so is unconstitutional.

218.

The Chief of Police is the final policy maker for all matters related to the training and discipline for officers employed by Defendant City of Atlanta. When she took office as Chief of Police, Chief Erika Shields had knowledge of the City's widespread pattern and practice of APD officers improperly using department-issued firearms and excessive deadly force in circumstances which do not authorize the use of deadly force and knowledge of the substantial risk that officers would violate the Constitution if this custom was allowed to continue uncorrected; Chief Shields nevertheless took no remedial action during her tenure as Chief and allowed the unconstitutional custom to continue.

219.

The frequency with which officers use deadly force when trying to apprehend a fleeing suspect reinforces the need for APD to provide competent and thorough training on the circumstances which authorize the use of deadly force.

220.

Despite knowledge that APD officers were failing to accurately report use of force, and that APD supervisors were failing to adequately investigate and supervise officers engaged in use of force, Defendant City of Atlanta has taken no action to resolve these issues.

221.

Despite knowledge that its officers have used deadly force to apprehend fleeing suspects in violation of the Fourth Amendment of the Constitution, Defendant City of Atlanta has taken no action to end this practice.

222.

Defendant City of Atlanta's failure to train its officers, and specifically failure to both discipline and train Officer Rolfe, were the driving force behind Officer Rolfe's belief that deadly force was authorized, and the driving force behind Officer Rolfe's decision to use deadly force against Mr. Brooks, which resulted in a bullet striking the vehicle occupied by Plaintiffs.

223.

Defendant City of Atlanta and their agents and employees, including but not limited to the Atlanta Police Department, Officer Rolfe, have acted willfully,

wantonly, and recklessly towards Plaintiffs, proximately causing their injuries. Therefore, no immunity applies in this matter.

### 224.

Defendant City of Atlanta and their agents and employees, including the Atlanta Police Department and Officer Rolfe, have exhibited a pattern and practice of ignoring and violating the rights of the citizens, by negligently hiring, training, supervising, and disciplining their employees, which proximately caused the injuries of Plaintiffs.

### 225.

Defendant City of Atlanta and their agents and employees, including Officer Rolfe, have exhibited a pattern and practice of ignoring and violating the rights of the citizens, by negligently hiring, training, supervising, and disciplining their employees, which proximately caused the injuries of Plaintiffs.  See *Favors. v. City of Atlanta*, 849 F. App'x 813, 917-18 (11th Cir. 2021).

### 226.

The custom, policies, and practices of Defendant City of Atlanta, as described herein, were a contributing cause and driving force leading to the violation of Plaintiffs civil and constitutional rights.

227.

As a direct and proximate result of the actions of the City of Atlanta, through the actions and omissions of APD, the City of Atlanta is liable to Plaintiffs for all damages allowed under Georgia and federal law, including damages for physical and emotional pain and suffering.

## COUNT FIVE

### ATTORNEY'S FEES AND LITIGATION EXPENSES AGAINST OFFICER ROLFE AND CITY OF ATLANTA

228.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

229.

The City of Atlanta and Officer Rolfe have been stubbornly litigious, acted in bad faith, and caused Plaintiff unnecessary trouble and expense. Consequently, Plaintiffs are entitled to recover the expenses of litigation and attorneys' fees incurred in the prosecution of this claim pursuant to O.C.G.A. § 13-6-11.

230.

Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to an award of reasonable attorneys' fees, expert costs, and other costs of litigation.

## **COUNT SIX**

## **PUNITIVE DAMAGES AGAINST OFFICER ROLFE**

### 231.

Plaintiffs incorporate by reference herein all allegations contained in the foregoing paragraphs of this *Complaint*.

### 232.

Plaintiffs are entitled to an award of punitive damages, without limitation or cap, because the actions of Officer Rolfe showed willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care, which would raise the presumption of conscious indifference to consequences and/or a specific intent to cause harm.

**WHEREFORE**, Plaintiffs pray that this Court issue the following relief:

1. That process issue in accordance with the law;

2. That the Court grant a jury trial on all claims so triable;

3. Award Plaintiffs compensatory, punitive, and consequential damages in an amount to be determined;

4. Award attorneys' fees and costs of litigation in an amount to be determined;

5. Grant such other relief as the Court deems proper.

Respectfully submitted this 18th day of April, 2023.

                              **THE COCHRAN FIRM ATLANTA**

                              /s/ Samuel L. Starks
                              Shean D. Williams, Esq.
                              Georgia State Bar No.: 764139
                              Samuel L. Starks, Esq.
                              Georgia State Bar No.: 676515
                              ***Attorneys for Plaintiffs***

100 Peachtree Street, NW, Suite 2600
Atlanta, Georgia 30303
T: 404-222-9922
F: 404-222-0170
swilliams@cochranfirmatl.com
sstarks@cochranfirmatl.com